IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JAMES THEODOR SJERVEY,

                  Plaintiff,

      v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

                Defendant.

OPINION AND ORDER

21-cv-41-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff James Theodor Sjervey seeks judicial review of a final decision denying his claim for supplemental social security income under the Social Security Act.  42 U.S.C. § 405(g).  The administrative law judge (ALJ) hearing the case found that plaintiff had a number of severe impairments but could still perform work in the national economy.

Plaintiff contends that this finding is erroneous in three respects: (1) the ALJ did not account for plaintiff's difficulties with reading when he found that there was a significant number of jobs that he could perform; (2) the ALJ provided flawed reasons for rejecting a March 2020 opinion from plaintiff's primary physician, Dr. Jeffrey Eichten; and (3) the ALJ misconstrued the evidence in determining that plaintiff did not need a walker for balance or walking.

Having reviewed the record, I find plaintiff's arguments unpersuasive.  Therefore, the acting commissioner's decision will be affirmed.

1

The following facts are drawn from the Administrative Record (AR) filed with the acting commissioner's answer (dkt. #15).

FACTS

A. Social Security Application

Plaintiff James Theodor Sjervey was 50 years old when he filed an application for supplemental security benefits on February 15, 2019, alleging that he had been disabled since December 2013. (This was plaintiff's second application; his first application, filed on November 12, 2014, was denied after a hearing on April 30, 2018. AR 76-90.) After his 2019 application was denied by the state agency, both initially and on reconsideration, he was granted a hearing before an administrative law judge, who held a hearing on April 6, 2020.

B. Plaintiff's Reading Ability

Plaintiff's complaints center on his physical problems, particularly pain in his left shoulder and in his lower back, but he also claims that he cannot read well enough to hold a job. (Plaintiff also alleged depression and anxiety, but it is unnecessary to discuss that evidence because he does not challenge any of the ALJ's findings with regard to those impairments.) The record evidence concerning plaintiff's reading abilities is mixed. In his disability application, plaintiff stated that he had finished 9th grade and had been in special education classes the entire time, and also said that he was able to read and understand

English and could write more than his name.  AR 313.  In an undated function report, plaintiff wrote that he could not handle a checkbook or money order because he could not read or write, AR 325, but in a July 2019 function report, he said he could pay bills, count change, and handle both a savings account and a checkbook.  AR 354.  He also said he was not good at following written instructions because he didn't read very well.  AR 356.  At the administrative hearing, plaintiff testified that because of dyslexia, he could not pass the written test required to obtain a driver's license, explaining that he "could never understand what [he] was reading."  AR 63.  Finally, plaintiff's primary care doctor, Jeffrey Eichten, M.D., observed in a March 7, 2014 office note that plaintiff "maybe has some difficulty reading," because he had asked the doctor to fill out a disability form that was primarily for plaintiff to fill out.  AR 405.

## C. Medical Evidence

Plaintiff's asserted physical complaints have been reviewed by a number of doctors.

### 1. Dr. Jeffrey Eichten

Dr. Eichten met plaintiff for the first time in December 2013 and thereafter became his primary physician.  Plaintiff was complaining of left shoulder pain that had caused him to take a break from his employer, Jack Links Corporation, and seeking short-term disability forms, which the doctor filled out for him.   AR 393.  Plaintiff said he had had no previous known injury to the shoulder.  Id.  X-rays showed only mild degenerative change of the

acromioclavicular (AC) joint in his shoulder.  AR 395.

Plaintiff saw Dr. Eichten often after his first visit, consulting him for pain on a frequent basis in 2014.  In February 2015, orthopedic surgeon Thomas Kaiser operated on plaintiff, performing a left shoulder arthroscopy, laser debridement, rotator cuff repair and other procedures, with no complications.  AR 428-29.

In October 2015, plaintiff had x-rays taken of his right shoulder, which he said had been painful for the preceding 12 months.  AR 725.  The x-ray showed the AC joint to be unremarkable; the glenohumeral joint was intact; the sumacromial space was preserved; and there was no abnormal soft tissue calcification or acute bony abnormality.  AR 726. In November 2015, plaintiff complained to Dr. Eichten of continuing left shoulder pain following his February 2015 surgery.  AR 609-10.

Also in November 2015, plaintiff reported his concern over "some balance issues," saying that he tended to run into things and lose his balance very easily.  AR 681.  He also said that he tended to fall asleep during the day.  AR 682.  Dr. Eichten noted that plaintiff had a normal gait and fine motor coordination, id., but had a "possibly positive" Romberg's test, which measures a person's balance.  He referred plaintiff to the Sleep Medicine department for suspected sleep apnea and suggested he consider a neurology consult for his reported gait instability.  Id.

In 2016, plaintiff saw Dr. Eichten a number of times.  He had a general medical checkup in May, at which he complained of chronic shoulder pain and arthritis.  AR 785. In July, Eichten wrote to report that plaintiff's recent nerve study had shown only mild

carpal tunnel syndrome on the right and suggested that plaintiff use carpal tunnel braces. AR 775.  In August 2016, plaintiff complained of ongoing left shoulder discomfort pain.  Dr. Eichten observed that plaintiff was "acting very weak" and not participating fully during physical examination, leading him to question whether plaintiff was malingering a little bit. AR 767.  Dr. Eichten noted that plaintiff had disability forms "that require [occupational therapy] assessment."  AR 766.  He referred plaintiff to occupational therapy and to Dr. Kuzel, an orthopedist, for his ongoing shoulder issues.

Lumbar spine imaging from 2017 showed that plaintiff had mild to moderate degenerative changes with diffuse disc protrusion and electromyography in January 2018 suggested bilateral sciatic neuropathy, but when Dr. Eichten examined plaintiff in February 2018, he found that plaintiff had no foot drop when he walked, a straight leg raising test was negative, his lumbar spine was nontender, and he "exhibited no exacerbation of his reported neuropathy."  AR 1622.  Nevertheless, the doctor completed a disability form on which he indicated that plaintiff was unable to ambulate effectively and could stand or sit for only 15 minutes at a time.  AR 1585.  Seven months later, in September 2018, Dr. Eichten reported that plaintiff was feeling well overall, and his lumbar stenosis and degenerative disk disease were stable.   AR 1608.

In October 2019, plaintiff told Dr. Eichten that he continued to struggle with chronic left shoulder pain and weakness, had numbness and tingling in his right arm from his elbow to his hand, and continued to be unsteady on his feet, with frequent falls.  AR 1904.  On examination, the doctor questioned whether plaintiff was giving his full effort to his grip

strength, which was 4/5 on the right and 3/5 on the left.  Plaintiff had limited range of motion and weakness in his left shoulder but had no tenderness over the AC joint.  With respect to plaintiff's reported falls, Dr. Eichten noted that his balance problems might be a medication side effect and suggested reducing one of his medications.  Id.  About three months later, however, Eichten prescribed a walker for plaintiff.

In March 2020, Dr. Eichten completed a Medical Source Statement for plaintiff, offering his opinion on plaintiff's work abilities.  The doctor said that plaintiff's capacity for sitting, standing, and walking was unknown; during the workday, plaintiff would have to change positions and would likely need unscheduled breaks; he would need a walker for ambulation; his pain would frequently interfere with his attention and concentration; and he would be likely to be absent from work more than four days a month. He also said plaintiff's shoulder weakness warranted lifting restrictions of 10 pounds occasionally and less than 10 pounds frequently, and that plaintiff could frequently perform fingering, grasping and handling activities, but could rarely reach, stoop, or crouch.  AR 1955-57.  In an office note written that same day, Eichten reported having prescribed a walker for plaintiff in January 2020 for plaintiff's gait instability and reported frequent falls.  AR 1963.  Dr. Eichten noted that he had completed a medical statement for plaintiff's attorney, but that "[a] lot of the questions are unknown about his ability; for example, how he could do in an 8 hour work day." Id.  The doctor noted that plaintiff would need a disability occupational therapy consultation to provide details about plaintiff's abilities.  Dr. Eichten further deferred to plaintiff's shoulder specialist, Dr. Kuzel, with respect to his left shoulder

6

complaints.  Id.

On examination by Dr. Eichten, plaintiff ambulated using the walker, without any evidence of foot drop or radiculopathy symptoms.  AR 1963.  Dr. Eichten diagnosed chronic gait instability, lumbar disk disease, arthritis, and a history of frequent falls.  Id.  He went over plaintiff's health record with him, recommending that he engage in physical therapy and strengthening exercises.  Id.  He also recommended that plaintiff have additional imaging of his shoulder as Dr. Kuzel had suggested in February 2018.  AR 1965.

2.  Dr. Bradley Kuzel

On February 14, 2018, plaintiff saw Dr. Kuzel for an evaluation of his left shoulder. On examination, Dr. Kuzel noted that plaintiff had a non-antalgic gait and global tenderness about the shoulder, including the AC joint.  Evaluation of his motor strength revealed decreased effort on examination in some areas, as did motion testing.  Id.  From his physical examination and review of plaintiff's prior shoulder MRI and updated x-ray, Dr. Kuzel saw no evidence of rotator cuff pathology and only mild AC joint arthrosis.  AR 1623.  In the doctor's opinion, plaintiff should have "significantly better range of motion and strength than he does at this time" and ought to have near normal function of the shoulder, but if he wanted to pursue the issue further, he should obtain an MR arthrogram of his shoulder.  Id. Plaintiff did not do so.

3. Dr. Shavith Samson

Dr. Samson performed a physical consultative examination of plaintiff in April 2019, noting that he had complained of having a history of left shoulder problems since 2013. AR 1708. On physical examination, the doctor found that plaintiff's gait was unsteady and antalgic, AR 1713; he complained of low back pain and numbness, as well as left shoulder pain, AR 1712-13; and he had moderate difficulty walking on his heels and toes, spine tenderness and inability to stand or hop on one foot bilaterally, but was able to squat and rise from that position with ease, rise from a sitting position without assistance, and get up and down from the exam table with ease. AR 1712.

From a review of the medical records, Dr. Samson determined that plaintiff had degenerative arthritis with moderate spondylosis around L5-S1, bilateral sciatic neuropathies, and a shoulder MRI that demonstrated labrum tear and AC joint arthritis. AR 1713. Assessing plaintiff's functional limitations, the doctor found plaintiff had no limitations with respect to sitting, but could stand and walk each for only 30 minutes at a time and four hours total in an eight-hour workday, with no need for an assistive device. Dr. Samson further offered the opinion that plaintiff could perform reaching activities occasionally and grasping, handling, fingering and feeling activities frequently. Id.

4. Dr. Megan Popp

In April 2019, plaintiff saw Dr. Popp, a doctor of physical medicine, complaining of bilateral low back pain that made it hard for him to walk or climb steps. AR 1732. Dr.

8

Popp noted that although plaintiff had tenderness in his lower back and guarded trunk motions, he appeared to have full functional use of his lower extremities, with an overall steady gait with shortened steps. His straight leg raise test was negative when seated and he described only a tight pulling sensation when performing the test lying down. AR 1733.

Plaintiff met with Dr. Popp again on May 30, 2019, to discuss his recent lumbar spine MRI and continued low back pain. AR 1742. The MRI showed disc displacement at L5-S1 that was more pronounced than it had been on the 2017 MRI and was causing moderate narrowing of the left lateral recess. AR 1743. On examination, the doctor reported again that plaintiff appeared to have full functional use of his bilateral overall extremities, a gait that was steady overall, with shortened step, and the ability to stand up from a chair independently without upper extremity support. Id. Dr. Popp discussed a number of treatment options with plaintiff, including surgery, physical therapy, or an epidural steroid injection. Plaintiff said he did not want to consider surgery until his symptoms worsened, he did not want an injection because a previous injection had only provided him one or two days of relief, and he declined a referral to physical therapy. Id.

5. State consultants

State agency consultants Pat Chan, M.D., and Mina Khorshidi, M.D., assessed plaintiff and concluded that plaintiff's physical impairments limited him to light exertional work with certain limitations. AR 117-31; AR144-47. On May 7, 2019, Dr. Chan wrote that plaintiff had a history of left shoulder problems dating from 2013, secondary to a lifting

injury, an MRI showed that he had joint arthritis and labrum tear, and lumbar spine x-rays indicated mild degenerative disc disease.  AR 127.  Dr. Chan noted that plaintiff was able to squat and rise from that position with ease, rise from a sitting position without assistance, and get up and down from the exam table with ease, but had some trouble with tandem walking, and walking on heels and toes.  Id.  Dr. Chan found plaintiff was limited to light work – meaning he could lift up to 20 pounds occasionally and 10 pounds frequently, stand or walk about 6 hours in  an eight-hour workday, and sit about 6 hours in an eight-hour day – but should avoid reaching overhead with the left arm or various postural activities (stooping, stair climbing, kneeling, etc.) more than frequently.  AR 125-27.

On reconsideration, Dr. Khorshidi reviewed plaintiff's May 2019 lumbar spine MRI and Dr. Popp's April and May 2019 physical examinations showing that plaintiff had full functional use of his legs and a steady gait with shortened steps, along with the medical evidence already on file.  AR 143-44.  On August 14, 2019, Dr. Khorshidi found that Dr. Chan's conclusion that plaintiff could perform light work with postural and reaching limitations reasonably reflected plaintiff's functioning.  Id.

D.  Vocational Expert Testimony

At plaintiff's administrative hearing, the ALJ asked a vocational expert to assume an individual who was capable of performing light work, but who could not climb ladders, ropes or scaffolds; could occasionally climb ramps or stairs; who could occasionally stoop, kneel, crouch, crawl or engage in activities requiring balance; who could frequently reach in all

directions with the left arm; and who was limited to performing simple, routine and repetitive tasks.  AR 65-66.  In response to further questioning, the vocational expert testified that such an individual would not be able to perform plaintiff's past work as a bulk food packager or caretaker, but would able to perform three representative, unskilled jobs, which she identified by their corresponding number in the Dictionary of Occupational Titles (DOT):  (1) Folder (DOT # 369.687-018); (2) Information Clerk (DOT # 237.367-018); and (3) Mail Clerk (DOT # 209.687-026).  According to the vocational expert, there are approximately 60,000 folder jobs, 49,000 information clerk jobs, and 27,000 mail clerk jobs existing in the national economy.  AR 66-67.  The expert further testified that no jobs would be available if plaintiff required the use of a walker.  AR 67.

The ALJ did not ask the vocational expert to account for plaintiff's limited education or alleged reading difficulties.


E.  Administrative Law Judge's Decision

Following the regulations' five-step sequential evaluation of disability, 20 C.F.R. § 416.920, the ALJ found at step one that plaintiff had not engaged in any substantial gainful activity since February 15, 2019, the date of his application.  At steps two and three, the ALJ found that plaintiff had the severe impairments of degenerative disk disease, degenerative joint disease of the left shoulder status-post surgery, chronic obstructive pulmonary disease (COPD), obesity, depressive disorder and anxiety disorder, AR 19, all of which had caused more than minimal work related functional limitations for at least twelve continuous

months.  Id.  The ALJ found that none of these impairments singly or in combination met

or medically equaled the severity of any  one of the listed impairments in 20 C.F.R. Pt. 404,

Subpt. P, App. 1.

Next, the ALJ assessed plaintiff's residual functional capacity.  He found that plaintiff

had the residual functional capacity to perform light work, as defined in 20 C.F.R.

§ 416.967(b), with limitations:

> never climbing ladders, ropes, or scaffolds, and occasional climbing of ramps
> or stairs, stooping, kneeling, crouching, crawling or engaging in activities
> requiring balance, as well as reaching in all directions with the left upper
> extremity.  He is also limited to occasional exposure to airborne irritants, such
> as fumes, odors, dusts, gases and poorly ventilated area, and he is limited to
> only occasional exposure to hazards, that is, working with machinery having
> moving mechanical parts, use of commercial vehicles or exposure to
> unprotected heights.  In addition he is limited to the performance of simple,
> routine and repetitive tasks.

The ALJ observed that although plaintiff's treatment records were "generally

consistent with [his] medically determinable impairments, they were not consistent with

[his] subjective reports of disabling symptoms and suggest that his symptoms are not as

severe as he alleged."  AR 24.  For example, three years after plaintiff's February 2015

shoulder surgery, the results showed that he had no evidence of rotator cuff pathology, only

"mild acromioclavicular joint arthrosis," and his orthopedist anticipated that he would be

able to return to "near normal shoulder function."  Id.  Moreover, in April 2019, additional

left shoulder x-rays of plaintiff had revealed intact findings with no evidence of fracture,

dislocation, or other bony abnormalities, whereas at a consultative examination the same

month, plaintiff displayed the abnormal findings of reduced range of motion and left upper

extremity weakness.  AR 24.  As the ALJ noted, despite these abnormal findings, plaintiff did not follow up with his orthopedist or have any additional workup done.  Id.

With respect to plaintiff's complaints of lower back pain and problems with ambulation, the ALJ noted that 2017 imaging had shown some mild to moderate degenerative changes in plaintiff's lumbar spine, and a 2018 EMG (electromyography test) was suggestive of bilateral sciatic neuropathy.  AR 24.  Nevertheless, noted the ALJ, plaintiff's physical examinations around that time did not reveal any problems with his legs, insofar as he had no foot drop, a negative straight raise test, or lower back tenderness.  The ALJ acknowledged that plaintiff presented with an unsteady gait and other positive findings at his consultative exam with Dr. Samson in April 2019, but pointed out that Dr. Popp did not observe such abnormalities when she examined him later that month and again in May 2019, instead finding that he had "full functional use" of his lower extremities.  AR 25.  The ALJ further noted that in May 2019, plaintiff declined offers of back surgery, physical therapy, or injection treatment.  Id.

The ALJ considered plaintiff's complaints of degenerative disc disease, degenerative joint disease, COPD, symptoms of depression and anxiety, and obesity, but concluded that plaintiff could still work, with restrictions.  AR 26.  The ALJ  gave weight to the medical findings of the two state agency consultants, Dr. Chan and Dr. Korshidi, both of whom reviewed plaintiff's medical record, and the ALJ adopted many of the restrictions they had found, finding them consistent with plaintiff's medical record.  AR 27.  On the other hand, the ALJ rejected Dr. Eichten's March 2020 Medical Source Statement on plaintiff's abilities,

finding it both unsupported and inconsistent with some of evidence in the record, including the assessments and examination findings by the specialists, Drs. Popp and Kuzel; plaintiff's failure to pursue various treatment options that were presented to him; and Dr. Eichten's admission that he was not sure what plaintiff's limitations were absent an occupational disability evaluation.  Finally, the ALJ found insufficient evidence that plaintiff needed a walker for a continuous period of 12 months.  In addition to the reasons already cited for rejecting Dr. Eichten's opinion, the ALJ observed that the doctor himself did not seem to be entirely persuaded that plaintiff's reported falls were tied to his back problems, having initially questioned whether plaintiff's falls were tied to the side effects of the medications he was taking.  AR 29.

At step four of his analysis, the ALJ found that plaintiff's limitations rendered him incapable of performing his past relevant work as a caretaker of his disabled child or as a bulk food packager.  AR 33.  However, relying on the vocational expert's hearing testimony, the ALJ found that a person of plaintiff's age (50), who had a limited education, no transferable work skills, and plaintiff's residual functional capacity could make a successful adjustment to other work that existed in significant numbers in the national economy. Accordingly, the ALJ found plaintiff not disabled at step five.  AR 33-34.  This decision became final when the Appeals Council declined to review it in October 2020, after which plaintiff filed this civil action for review of the agency's decision.

OPINION

The case is now before this court to determine whether the ALJ's decision is supported by substantial evidence, that is, "sufficient evidence to support the agency's factual determinations." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). The threshold for sufficiency is not high; the substantial evidence standard requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination. Moon v. Colvin, 763 F.3d 718, 721 (7th Cir. 2014). In reviewing an ALJ's decision, the court applies a common-sense reading and considers the opinion as a whole. Winsted v. Berryhill, 923 F.3d 472, 478 (7th Cir. 2019).

Plaintiff contends that he is entitled to a ruling in his favor for three reasons. First, the ALJ failed to consider his difficulty in reading and writing when finding that work existed which plaintiff was capable of doing; second, the ALJ erred in giving little or no weight to the March 2020 opinion of Dr. Eichten; and third, the ALJ erred in finding that plaintiff did not need a walker.

## A. Plaintiff's Reading Difficulties

As plaintiff appears to concede, the ALJ correctly noted that there was no objective evidence showing that plaintiff has ever been found to have dyslexia or formally diagnosed with any type of reading or learning disorder. Nevertheless, plaintiff argues, given the substantial evidence in the record supporting plaintiff's claim of reading difficulties, the ALJ

15

was obligated to account for these difficulties in the RFC assessment and corresponding hypothetical posed to the vocational expert.  Although plaintiff suggests in his initial brief that the ALJ should have found him illiterate as that term is defined in the regulations, see 20 C.F.R. § 416.924(b) (defining illiteracy as "the inability to read or write a simple message such as instructions or inventory lists even though the person can sign his or her name"), on reply he clarifies that regardless whether he meets the regulatory definition, the ALJ erred by failing to include limitations on reading and writing when describing his various limitations to the vocational expert.  Plaintiff further points out that although the ALJ found him to have a limited education, the ALJ never asked the vocational expert to consider this factor when stating his opinion about the kinds of jobs that plaintiff could perform.

As noted above, the vocational expert identified three jobs she believed plaintiff could perform in response to the ALJ's hypothetical.  The first job is that of "information clerk," DOT # 237.367-018, which involves "answering inquiries regarding departures, arrivals stops, and destinations of scheduled buses or trains;" "computes and quotes rates for interline trips, group tours and special discounts for children and military personnel, using rate tables."  The second is the job of a "mail clerk" (or mailroom clerk, mail sorter, or postal clerk), DOT # 209.687-026, which entails sorting mail for distribution and dispatching outgoing mail, stamping, sorting mail, and readdressing undeliverable mail.  Both jobs are classified as "unskilled," but the job of "information clerk" appears to require both math and reading skills and the job of mail clerk requires reading skills.   I agree with plaintiff that, even if he may not be illiterate, the ALJ's finding that plaintiff could perform these two jobs

is questionable, given plaintiff's apparent difficulty with reading.  Griffo v. Astrue, 767 F. Supp. 2d 912, 923 (N.D. Ill. 2011) (although ALJ "highlighted  facts in the record that would contradict any claim of illiteracy, he seemingly ignored the more difficult question about whether Claimant's reading, math, and reasoning abilities would allow Claimant to perform the jobs on which the ALJ's step-five finding relied.").

However, as plaintiff appears to concede, the third job of "folder," DOT # 369.687-018, does not involve either math or reading skills and appears to be one that plaintiff could perform.  It consists of folding laundry, inspecting it for holes or tears, matching socks, tying socks into bundles and separating defective articles for transfer to the repair department.  The vocational expert testified that 60,000 such jobs exist in the national economy.  The Court of Appeals for the Seventh Circuit has found that 55,000 jobs is sufficient to meet the commissioner's burden at step five.  Collins v. Berryhill, 743 F. App'x 21, 25-26 (7th Cir. 2018) (55,000 jobs nationwide significant).  Accordingly, even if the ALJ might have erred in failing to account for plaintiff's reading difficulties when formulating his hypothetical to the vocational expert, that error was harmless because there remain a significant number of jobs that plaintiff could perform.  Id. (failure of ALJ to resolve conflict between vocational expert's testimony and that of Dictionary of Occupational Titles was harmless error in light of fact that ALJ also relied on DOT position that was appropriate for plaintiff's abilities).

## B. Dr. Eichten's Opinion

Plaintiff argues that the ALJ provided flawed reasons for rejecting Dr. Eichten's March

2020 opinion about plaintiff's functional abilities, which would limit him to at most sedentary work and a corresponding finding of "disabled" under the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, App. 2.  Under the SSA's 2017 "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844 and 82 Fed. Reg. 15132, the ALJ was not required to give any specific evidentiary weight to Dr. Eichten's opinion, and needed to explain only how persuasive he found the opinion, taking into consideration the degree to which it was supported and consistent with other evidence in the record.  20 C.F.R. § 416.920c(a).

In rejecting Dr. Eichten's various opinions about plaintiff's limitations, the ALJ explained that he found them lacking adequate support and inconsistent with the medical evidence.  Specifically, the ALJ noted that:  (1) the doctor noted that several of plaintiff's functional abilities were "unknown" to him; (2) Dr. Popp had found plaintiff to have intact lower extremity function during the relevant period of alleged disability; (3) Dr. Eichten failed to provide support for his prediction about plaintiff's absenteeism; (4) his accompanying treatment notes indicated that plaintiff's left shoulder issues were best addressed by Dr. Kuzel, the shoulder specialist, who had previously noted the expectation that plaintiff's shoulder would return to normal; and (5) plaintiff was not receiving any ongoing specialist treatment for his low back or shoulder complaints.

Plaintiff criticizes each of these reasons, arguing that they do not suffice to build "an accurate and logical bridge between the evidence and the result." Moon, 763 F.3d at 478. Specifically, he argues that the ALJ ignored certain evidence that was consistent with Dr.

Eichten's opinions about plaintiff's back-related limitations, namely, records showing that plaintiff fell and broke his wrist three months after Dr. Popp's evaluation and the lumbar MRI and EMG showing that plaintiff had spinal stenosis and sciatic neuropathy.  He also argues that in rejecting Eichten's opinion that plaintiff could lift no more than 10 pounds, the ALJ ignored Dr. Eichten's observation during one clinic visit that plaintiff's left shoulder girdle was "atrophic."  Plaintiff further argues that Dr. Eichten's admission that he did not know all of plaintiff's functional restrictions shows professional restraint rather than overreach, as the ALJ concluded.

Plausible though plaintiff's interpretation of the evidence may be, he has failed to show that the ALJ misunderstood or overlooked any important evidence or that his rationale for rejecting Dr. Eichten's opinions rest upon flawed logic or serious errors in reasoning.  The ALJ noted both the MRI and EMG findings in his decision, but also noted that plaintiff had a steady gait, negative straight leg test and full functional use of his lower extremities when evaluated by Dr. Popp in April and May 2019.  He further noted that plaintiff was not receiving any specialist treatment for his back and had declined therapy, surgery, or an injection, which suggested that his symptoms were not severe as he alleged.  Moreover, the ALJ was well within reason to discount Dr. Eichten's opinion, given the doctor's acknowledgment that he had completed the form "to the best of [his] ability" but that plaintiff "would need a disability occupational therapy consultation for more detail," just as he was justified in placing more weight on Dr. Kuzel's evaluation of plaintiff's left shoulder functioning given that doctor's speciality as an orthopedist. AR 1963.  Overall, given Dr.

19

Eichten's admitted uncertainty about the extent of plaintiff's limitations, the examination findings by the specialists, Dr. Popp and Dr. Kuzel, which suggested far lesser restrictions, plaintiff's lack of followup with specialists and failure to pursue treatment options, and the contrary opinions by the state agency physicians, the ALJ had ample reasons to reject Dr. Eichten's opinion, notwithstanding the existence of some contrary evidence in the record. Edwards v. Sullivan, 985 F.2d 334, 336-37 (7th Cir. 1993) (where "conflicting evidence allows reasonable minds to differ," court must defer to the ALJ) (citation omitted).


C.  Need for a Walker

Finally, plaintiff challenges the ALJ's finding that he did not require a walker, arguing that the ALJ placed too much weight on two facts:  (1) Dr. Eichten's initial uncertainty whether plaintiff's reported falls were the result of medication side effects; and (2) plaintiff's denial of radiculopathy symptoms during his March 2, 2020 visit with Dr. Eichten.  This argument requires little's discussion.  Although far from compelling, neither plaintiff's denial of radiculopathy symptoms nor Dr. Eichten's initial reluctance to attribute plaintiff's balance problem to his back issues was an illogical reason for the ALJ to question the supportability of the walker restriction.  And even if this is wrong, the ALJ cited sufficient additional reasons for his finding, namely, plaintiff's demonstrated normal gait and intact use of his lower extremities during his examinations by Dr. Popp, his failure to pursue various treatment options, and Dr. Eichten's acknowledgment that he was not entirely sure what plaintiff's functional abilities were.  Plaintiff does not challenge any of these reasons, which are

20

sufficient to support the ALJ's determination that the record did not support limitations involving use of a walker.

ORDER

IT IS ORDERED that the decision of Kilolo Kijakazi, Acting Commissioner of Social Security, is AFFIRMED and the appeal of plaintiff James Theodor Sjervey is DISMISSED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 8th day of December, 2021.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge